PORTLAND SHIPPING CO. *v.* THE ALEX GIBSON.

O'BRIEN *v.* PORTLAND SHIPPING CO.

*(District Court, D. Washington, N. D.    October 31, 1890.)*

1. CHARTER-PARTY—INTERPRETATION OF CONTRACT—STEVEDORE.
    A charter-party containing a clause reading, "The vessel to employ stevedore satisfactory to charterers; but, if appointed by them, the charge not to exceed that current at the time, and to be stowed under the captain's supervision and direction," —does not give the charterer an absolute right to select the stevedore.  A clause so worded is to be understood as an agreement that the stevedore must be satisfactory to both parties; and in such a case the charterer is not entitled to damages because of delay in commencing to load, resulting from a disagreement between him and the master in regard to the selection of a stevedore.

2. SAME—BREACH OF CONTRACT—DAMAGES.
    Damages cannot be recovered by the charterer by reason of the vessel having been removed from the loading port previous to the signing of the bills of lading, and without sailing orders from him, where the master acted prudently, and for the interest of all concerned, and the charterer suffered no loss or injury thereby.

3. DEMURRAGE.
    Delay in loading, resulting from the failure of the charterer and master of the vessel to agree in selecting a stevedore, where the contract requires the employment of a stevedore satisfactory to both, does not give the vessel a right to demurrage.

4. ADMIRALTY—DETENTION OF VESSEL—DAMAGES.
    The arrest and detention of a vessel by legal process in a suit *in rem*, which, although unfounded, is not *mala fides*, does not entitle the owner to damages.

*(Syllabus by the Court.)*

In Admiralty.

*C. E. S. Wood,* for libelant.

*J. C. Haines,* for claimant and cross-libelant.

HANFORD, J.    The ship Alex Gibson was chartered by the libelant to carry a cargo of wheat from Tacoma to a port in Europe to be designated by the charterer.    A charter-party was signed in Portland, in the state of Oregon, containing, among others, the following provisions:

"The vessel to employ stevedore satisfactory to charterers; but, if appointed by them, the charge not to exceed that current at the time, and to be stowed under the captain's supervision and direction.    Charterers to furnish the vessel with sufficient cargo for stiffening, as customary.    The captain gives them usual 48 hours' written notice of when the vessel will be ready to take in same, and of the quantity required.    *    *    *    Bills of lading to be duly and promptly signed when required by charterers.    *    *    *    30 working lay days, (rainy days not to be counted as lay days,) to commence twenty-four hours after the inward cargo $^{and}_{or}$ ballast shall have been finally discharged, and the captain has given charterers written notice that his vessel is ready to receive cargo, are to be allowed charterers for loading and waiting orders at Tacoma, as hereinbefore provided.    *    *    *    Loading days not to commence before December 15, '87, except at charterer's option.    *    *    *    It is agreed that for each and every day's detention by default of said parties of the second part, or their agents, four pence sterling, or equivalent, per register ton per day shall be paid, day by day, by said parties of the second part, or their agent, to said party of the first part, or his agent."

The ship was at her loading berth, and ready to receive stiffening, on December 12, 1887, but the charterer, although then ready with sufficient wheat on hand, refused to load her, because of a disagreement with the master of the ship as to the selection of a stevedore, and insisted that certain persons, who were objectionable to the master, and none other, should be employed to stow the cargo; and in consequence of this disagreement the loading was not commenced until January 5, 1888. The contract does not, by any express provision, bind the vessel to commence loading or to sail by any particular date; but the libelant claims that the delay in commencing to load was a violation on the part of the vessel of the implied condition of the charter-party that she should, with reasonable promptness and dispatch, receive her cargo and proceed upon the voyage. As soon as she was loaded, the vessel, contrary to orders from the charterer to avoid expense which would result from detention of a tug, left Tacoma, and was towed to Port Townsend, the place to which she had to go to ship her crew for the voyage. Bills of lading were not signed, nor presented to the master for his signature, before the ship left Tacoma; but the captain returned and signed them at that place while the ship was at Port Townsend, in fulfillment of a promise made by him to the charterers' agent before leaving there. The libelant claims that by so leaving the loading port without orders, and previous to the signing of the bills of lading, the charter-party was also violated on the part of the ship.

For these alleged breaches of contract the libelant brought this suit to recover as damages an amount sufficient to cover a loss alleged to have been sustained by reason of the decline in price of wheat in England between the times when the Alex Gibson should have been loaded, if the charterers' stevedore had been employed at first, and the time when she was actually loaded; and also certain alleged disbursements and expenses, including counsel fees.

I hold that the charter-party cannot be fairly understood or construed so as to support the libelant in its contention for the absolute right to select a stevedore, and to insist on that stevedore, and none other, being employed by the master, regardless of his will. To employ a person is to contract with him, so as to become liable to him for compensation, and to assume the responsibilities and liabilities of an employer; and requires the meeting of minds and the free assent of both parties to the assumption of the relation of master and servant. It is usual in the charter-party to provide that the vessel shall employ the charterer's stevedore. Such an agreement is fair, because, by its terms, it indicates a particular stevedore, and the master or owner by entering into the contract assents to his employment; and such a provision in the charter-party is not inconsistent with the right of the master to discharge the employe for disobedience, incompetency, or other sufficient cause. But an agreement binding one to employ for a particular service, requiring skill and fidelity, whomsoever should be selected in the future by another, regardless of the employer's judgment at the time as to the competency and trustworthiness of the one so to be selected, would be un-

reasonable, for it would be the same as for a man to promise to in the future willingly do something contrary to his will. The agreement under consideration is not so worded as to express an intention to bind the vessel to employ as stevedore a person objectionable to the master, and I cannot by construction give to it that meaning. What is termed the "stevedore clause" in this contract is unusual, ambiguous, and meaningless, unless construed to mean that a stevedore satisfactory to both parties should be employed. I shall so construe it rather than reject it altogether as being void for uncertainty.

The attempt made to aid in giving the contract the interpretation contended for by the libelant, by offering proof of a general custom at Portland, where this charter-party was signed, allowing the charterer the absolute right of selecting the stevedore under an agreement worded as this one is, fails of its object. The testimony shows that in Portland there are only two persons or firms engaged in stevedoring, both of whom are satisfactory to the shippers of wheat, and that the form of the stevedore clause in this contract was adopted there, as a substitute for the usual clause, for the express purpose of allowing the ship-masters to employ either of said stevedores as they should elect. This does not even tend to prove any general custom or practice which would require the master to yield to the charterer in case of a disagreement between them as to the selection of a stevedore.

There was no breach of contract by failure to sign the bills of lading, because the captain did sign them when they were presented for his signature, and until then the contract did not require him to sign them. The master acted reasonably in proceeding to Port Townsend with his vessel when she was ready to go, and the tug was ready to take her, and, although such proceeding without orders was technically a violation of the charter-party, still the libelant was not injured thereby, and is not on that account entitled to recover damages.

As the court cannot find that the contract has been violated to the injury of the libelant, no damages can be awarded to it, and the libel will be dismissed.

The owner of the vessel has filed a cross-libel, to recover demurrage for the time the ship was delayed in loading in excess of what would have been the lay days if there had been no disagreement as to the employment of a stevedore, and also damages for the time the ship was detained by legal process after being arrested by the marshal under the attachment and monition issued in this case.

As to the first part of this claim, I think it is right in this case to hold the parties to the letter of their contract as to lay days; and I find from the evidence that the ballast was not all discharged, and the ship was not finally made ready for her cargo, until the 12th day of January, 1888, so that the 14th day of January must be counted as the first lay day, the six intervening Sundays and two stormy days must be omitted from the count, and the result is that February 20th was the last of the lay days, according to the terms of the contract. The ship was loaded and left Tacoma February 16th. The bills of lading were

signed and her orders to sail were given on the 20th. Her crew was shipped and the last man was received on board on the 23d, and on that day she could have sailed if this suit had not been commenced. After filing a satisfactory stipulation, she was released, and on March 8th proceeded on her voyage, under command of a new master; Capt. Speed being obliged, on account of this suit, to remain. The time, therefore, of actual detention of the vessel by the use of legal process in this case was from February 23d to March 8, 1888, 14 days. I do not find that the libelant was prompted by malice in commencing this suit. Its officers and legal advisers may have honestly entertained the belief that sufficient ground for the proceeding existed; but certainly, as the commencement of proceedings was delayed until after the ship was loaded, and the bills of lading were duly signed and delivered, the case was managed so as to force the vessel either to compromise, and pay an unjust claim, or suffer the greatest possible inconvenience and loss by being delayed while resisting the demand; and, as the court finds that the libelant had no cause of action, it follows that the arrest and detention of the ship was wrongful, and the owner suffered thereby a serious pecuniary loss. But for this he is without remedy, for in proceedings *in rem* the allowance of process is the act of the law, so that no damages are allowed for the arrest and detention of the vessel unless there is bad faith or deceit practiced in suing out the writ, or the suit is one that may be characterized as a malicious prosecution. Hen. Adm. p. 337; *The Adolph*, 5 Fed. Rep. 114; *Kemp* v. *Brown*, 43 Fed. Rep. 391.

The expenses of the litigation have not been to any appreciable amount increased by reason of the cross-libel beyond what was necessary in resisting the libelant's demand. But for the original suit, it is not probable that any expense or trouble would have been caused by the cross-libelant; therefore, no costs will be awarded against him. Findings in accordance with this opinion may be prepared, and a decree dismissing the libel, with costs, and also dismissing the cross-libel, will be entered.