THE AMIRAL CECILLE.

THE MULTNOMAH.

(District Court, D. Washington, W. D.   January 10, 1905.)

No. 455.

1. ADMIRALTY—SUIT IN REM—DAMAGES FOR DETENTION OF LIBELED VESSEL.
    Where a suit in rem for collision was brought in good faith, and there has been no abuse of the court's process, the respondent vessel cannot maintain a cross-libel for damages caused by her seizure and detention.

2. COLLISION—STEAMER AND ANCHORED BARK IN FOG—VIOLATION OF HARBOR REGULATIONS.
    A steamer which came into collision with an anchored bark in passing out of the harbor at Tacoma in a dense fog *held* in fault for her failure to exercise the extraordinary care required of her under the circumstances, in view of the fact that there were a large number of vessels in the harbor at all times, it appearing that she was allowed to deviate from her true course through the channel, which would have taken her past the bark in safety.   The bark also *held* in fault for being anchored, without a permit from the harbor master, in a part of the harbor where anchorage without such permit was prohibited by the harbor regulations.

3. SAME—IMPROPER ANCHORAGE—LIABILITY FOR ACT OF TUG.
    Where a tug acting as local pilot for a bark anchored her in a harbor in violation of a reasonable harbor regulation, the bark is responsible for the act, and liable for a resulting collision.

4. SAME—NEGLECT OF HARBOR MASTER TO ENFORCE REGULATION.
    The fact that a harbor master, whose permit was required to authorize a vessel to anchor in a certain part of the harbor, saw a vessel anchored without a permit within the prohibited zone, and made no objection, or that he habitually neglected to enforce the regulation, is not the equivalent of a permit, and does not exonerate the vessel from liability for the consequences of its violation.

In Admiralty.   Cross-libels to recover damages for injuries to the Multnomah, caused by colliding with the French bark Amiral Cecille in Tacoma Harbor in a dense fog; and for the loss to the owner of the bark from her detention by the marshal pursuant to a writ of attachment in this suit.   Decision on the merits in favor of the libelant for half damages and costs.   Cross-libel dismissed, with costs.

James M. Ashton, J. W. Robinson, and Frank H. Kelly, for libelant. Hughes, McMicken, Dovell & Ramsey, for cross-libelant.

HANFORD, District Judge.   The owner of the steamboat Multnomah commenced this suit to recover damages for injuries to her hull and cabins caused by the steamer colliding with the French bark Amiral Cecille under the following circumstances:   The Multnomah is a carrier of passengers and freight, making regular trips on a route between Olympia and Seattle via Tacoma, her berth at Tacoma being on the west side of a dredged-out waterway 600 feet wide, which is one of the improvements of Tacoma Harbor, and it was necessary for her to enter the waterway twice each day in making her daily runs.   An ordinance of the city of Tacoma prescribing harbor regulations contains a section prohibiting the anchoring of vessels within a prescribed zone, including the waterway and the entrance thereto, without a per-

mit in writing from the harbor master, the manifest object being to maintain an unobstructed fairway for vessels going in and out of the waterway. For the convenience of shipping, the city of Tacoma provided several buoys in the harbor for mooring ocean going vessels, and the ordinance referred to contains a section authorizing ships to moor at said buoys by permission of the harbor master and upon payment of a fee of $10 for 15 days' use; one of said buoys, commonly called the "Government Buoy," being situated within the zone in which vessels are prohibited from anchoring without a permit, and which, for convenience, will be hereafter referred to as the "prohibited zone." On the 9th day of November, 1904, the bark, having completed the taking on board of her cargo from her berth in the waterway, was towed by a local tug to the place where she was anchored at the time of the collision on the evening of the following day, the towage service being performed under the personal direction of the manager of the tug-boat company, and the bark dropped her anchor by his direction at a place selected by him within the prohibited zone near the location of the government buoy. He was influenced to some extent, if not entirely, in choosing that location, by the prevalence of a dense fog which settled down upon the harbor while the bark was being towed out of the waterway, and by finding some parties with a pile driver engaged in lifting the anchor and chain of the government buoy, which had become severed and drifted away, and by the further facts that vessels had theretofore frequently anchored within the prohibited zone without permits from the harbor master, and that the city authorities habitually neglected to enforce the regulation prohibiting vessels from anchoring there without permits. The fog continued to envelop the harbor and surrounding country from the time the bark anchored until the collision, with the exception of a short interval during the afternoon of November 10th, when it lifted so that the bark was visible to people on the docks and wharves, and during that time she was noticed and her position observed by the harbor master, who, as a witness in this case, testified that he considered her to be in a safe position, and took no steps to have her removed. While the bark was at anchor in the position described, and before the happening of the collision, the Multnomah passed her, in making her regular runs, five times, without coming near enough to raise an alarm of danger from collision on either vessel, and according to their testimony the officers of the Multnomah did not see her on either occasion, nor locate her position. The accident happened at about 7:15 p. m., as the Multnomah was coming out of the waterway and being steered towards Brown's Point on her run from Tacoma to Seattle, the starboard bow of the Multnomah striking the starboard bow of the bark a glancing blow, and as she continued forward with her momentum she was raked and her cabins damaged by the bark's cathead.

The libel charges that the bark was in fault and responsible for the collision, because (a) she failed to give warning of her presence by ringing a bell or otherwise signaling, as it was her duty to do when she could not be seen on account of prevailing fog; (b) she was anchored, without necessity, in the fairway, without a permit from the harbor master of Tacoma, in violation of the harbor regulations prescribed by

a city ordinance; and (c) she was anchored, without necessity, in a navigable channel, in violation of the act of Congress of March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543]. The answer makes an issue as to all of the faults charged by the libel, and places the blame wholly upon the Multnomah, on the ground that her officers and crew were negligent, and that she was going at a dangerously high rate of speed when it was impossible to see objects at any distance ahead of her. The bark was not injured, but in the cross-libel damages are claimed on account of the detention of the bark by her seizure under the process of this court issued in this case at the instance of the libelant. The court being satisfied that the suit was commenced in good faith, and that there has been no abuse of judicial process, the cross-libel has been heretofore dismissed, under the rule stated in the case of Portland Shipping Company v. The Alex Gibson (D. C.) 44 Fed. 371. The libelant having the affirmative side, and the Multnomah being herself the active force which caused the injury, she must sustain the burden of proof to establish the legal liability of the bark for damages; and, this being so, it is proper to first consider the conduct of the Multnomah, and determine whether she is blameworthy for the accident. By reason of the peculiar conditions of the weather at the time, and the large number of vessels at all times afloat in the harbor, it was the duty of the captain and crew of the Multnomah to be vigilant and cautious to an extraordinary degree to avoid accidents in operating the steamer. As she had passed and repasssed the bark at anchor several times in going in and out of the waterway without a collision, it is certain that the bark, located as she was, did not necessarily constitute such an obstruction of the entrance to the waterway as to prevent ingress and egress in safety by vessels navigated with the required degree of extraordinary prudence. It is extremely difficult to determine satisfactorily the precise position of the bark on account of the conflicting evidence given by the different witnesses, but, assuming her position to have been as indicated by reference to the figures "H. 2" on the map introduced in evidence and designated as "Libelant's Exhibit 1," and accepting as true the testimony of the Multnomah's captain to the effect that in backing and curving to get away from her berth and out of the waterway just previous to the collision, and in taking her course to pass Brown's Point, the Multnomah described the lines indicated upon libelant's Exhibit 1 by the letters "m, m, m, m, m," and assuming that her course towards Brown's Point is correctly indicated upon said map, I must conclude that she was not steered with the degree of extraordinary care and precision which the exigencies of the situation made necessary; for, if she had been held steady upon the true course towards Brown's Point from the time of coming to the position indicated by the fifth letter "m," she would have passed the ship without harm. Therefore it is a fact proven by the evidence, most favorable to the libelant, that the Multnomah was permitted by her helmsman to swing too far to the eastward, instead of being held upon the course which her compass must have indicated as her habitual course towards Brown's Point. By clear and convincing evidence it has been proved to my satisfaction that the equipment of the bark included an excellent bell, and that, instead of the bark being

in fault by reason of failure on the part of her officers and crew to give warning of her presence, as the libel charges, said bell was rung faithfully at short intervals during the time when the Multnomah was in the vicinity preceding the collision, and that, if they had been alert, the officers and crew of the Multnomah could not have failed to hear the bell and determine the location of the bark in sufficient time before the collision to have enabled them to keep the Multnomah away from harm by handling her with skill; and I am constrained to decide that there was inexcusable negligence on the part of the captain and helmsman of the Multnomah in steering her, without which the collision could not have happened. This fault, being sufficient to account for the accident, brings the case within the rule which denies to a libelant the right to recover damages for injuries caused by a collision when his own vessel is an offender in running against a vessel at anchor, unless a fault on the part of the other vessel, which was a contributing cause of the accident, can be proved by clear and convincing evidence. The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Newburgh (C. C. A.) 130 Fed. 321.

As already stated, the evidence proves that the officers and crew of the bark were not guilty of negligence in failing to ring her bell, and the court cannot, upon the conflicting evidence, find that she was anchored in the entrance of a navigable channel, or so near thereto as to constitute an actual obstruction to navigation, in violation of the act of Congress above cited; and the evidence proves that the Multnomah could have passed her, even in a dense fog, without harm, by the exercise of extraordinary care. This leaves no ground for a division of damages other than the fact that the bark was anchored within the prohibited zone without a permit from the harbor master, and whether she is, by reason of that fact, legally liable for one-half the loss caused by the collision is the only question in the case now remaining to be decided. In reaching the conclusions above stated, I have proceeded upon a theory that the Multnomah's fault was in the failure of her helmsman to steer her with the degree of extraordinary care and precision which the peculiar conditions then existing made necessary, but in adopting this theory I have not intended to decide that she was not guilty of other faults contributing to the accident. One fault sufficient to account for the accident having been proved to a certainty, it is not necessary to devote time and labor to consideration of the questions raised by the pleadings and arguments with respect to other alleged faults on her part. And I will say further that I have not intended to decide or intimate that it was necessary or proper to anchor the bark within the prohibited zone.

The evidence introduced in behalf of the respondent locates the bark at the time of the collision approximately 400 feet from the place indicated by "H. 2" upon libelant's Exhibit 1. Both locations are unnecessarily near to the track of vessels entering and leaving the waterway, and this is so because there is in the harbor of Tacoma an abundance of room for anchorage at a safe distance from the track of vessels coming into and leaving the wharves and docks; and the circumstances above narrated do not, in my opinion, afford a reasonable excuse for the action of the tugboat manager in anchoring the

bark within the prohibited zone. He knowingly violated a reasonable regulation prescribed by lawful authority, and for the consequences of his act while in the service of the bark as a local pilot the bark is liable to respond in damages. The Robert Rickmers (D. C.) 131 Fed. 638. There is no probability whatever that the accident would have happened if the ordinance had not been violated by anchoring the bark in that part of the harbor which I have referred to as the prohibited zone. It is true that, if a permit had been applied for, it might have been granted by the harbor master; but it is not fair to assume that he would have granted such an application, and it is sufficient for the purposes of this case to find that the permit was not obtained, and without it the bark was prohibited from anchoring at the place where she was anchored. It is my opinion that the mere failure of the harbor master to exert his authority to enforce the city ordinance is not the equivalent of a permit in writing, and does not condone the offense. In the case of Wilhelmsen v. Ludlow (D. C.) 79 Fed. 979, this court refused to award damages claimed against the commanding officer of a public war vessel of the United States for injuries to a steam vessel caused by colliding with the war vessel at anchor, in clear daylight, in the harbor of Seattle, which claim was based upon the ground that the war vessel was anchored in the harbor without a permit from the harbor master, in violation of a city ordinance which required a permit to anchor anywhere within the city limits. The court questioned the right of the city to exact compliance with such an ordinance by vessels of the navy, but the decision was grounded upon the allegations of the libel, which frankly disclosed misconduct on the part of her officers in bringing an unmanageable steamer into such near proximity to a vessel at anchor in clear daylight that the collision could not be prevented by the use of her machinery and anchors; and there being no reason for presuming that, if a permit had been applied for, the commanding officer would not have been allowed to choose for himself a location in the harbor, the court decided that there was no contributing fault on the part of the defendant. By the ancient codes of maritime law, if a vessel under way collided with another vessel at anchor without a willful or intentional fault on the part of the moving vessel, the loss had to be shared equally by the owners of both vessels. Laws of Oleron, art. XIV; Ordinances of Wisbuy, art. XXVI, and article LXX; Fed. Cas. vol. 30, Append., pp. 1178, 1191, 1195. In this case there is no evidence to justify a finding that the captain or crew of the Multnomah caused the collision willfully or intentionally. In the case of The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, the Supreme Court declared the law as follows:

"But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributing cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

This was repeated and declared to be the settled rule in collision cases by the Supreme Court in Richelieu Nav. Co. v. Boston Ins. Co., 136 U. S. 422, 10 Sup. Ct. 934, 34 L. Ed. 398. The same rule was again re-

iterated in the case of Belden v. Chase, 150 U. S. 699, 14 Sup. Ct. 264, 37 L. Ed. 1218. And in the case of the United States v. St. Louis & Miss. Transportation Co., 184 U. S. 255, 22 Sup. Ct. 350, 46 L. Ed. 520, the Supreme Court held that local harbor regulations are necessary aids to commerce, and must be obeyed, like other statutory requirements, and that, where a vessel "anchors in an unlawful position, or fails to observe the statutory requirements and such other precautions as good seamanship would suggest, it must suffer the consequences attending a violation of the law." In this the court quotes, with approval, Spencer on Marine Collisions, §§ 99, 106.

These decisions of the Supreme Court are controlling, and, in accordance with the law thus declared, I feel bound to decide that in this case the Multnomah and the Amiral Cecille are equally responsible for the collision. Unless the parties agree upon the amount, the case will be referred to a commissioner to make a computation of the damages, and a decree for one-half thereof and half costs will be entered in favor of the libelant.