COMPAGNIE DE NAVIGATION FRANÇAISE v. BURLEY et al.

(District Court, W. D. Washington, W. D. October 3, 1910.)

No. 604.

1. INDEMNITY (§ 14*)—CONCLUSIVENESS AS AGAINST INDEMNITOR OF FORMER ADJUDICATION AGAINST INDEMNITEE.

Where a person is responsible over to another for whatever may be justly recovered in a suit against such other and he is duly notified of the pendency of the suit, requested to defend, and given an opportunity to do so, the judgment therein, in the absence of fraud or collusion, will be conclusive in a subsequent suit against him for indemnity.

[Ed. Note.—For other cases, see Indemnity, Cent. Dig. § 41; Dec. Dig. 14.*]

2. PILOTS (§ 16*)—HARBOR PILOTS—DEGREE OF CARE AND SKILL REQUIRED.

A harbor pilot is selected largely for his knowledge of local conditions affecting the safety of the vessel. He must be familiar with all such conditions, and must not only remember and avoid all the dangers of a physical nature, but must also know and observe all the lawful regulations of the local authorities affecting the conduct of the ship. If, through his negligence the ship suffer loss, either directly or because it commits injury to others, he is liable for indemnity.

[Ed. Note.—For other cases, see Pilots, Cent. Dig. § 19; Dec. Dig. § 16.*]

3. TOWAGE (§ 11*)—NEGLIGENT ANCHORAGE OF TOW—RECOVERY OF DAMAGES AGAINST TOW FOR COLLISION—LIABILITY OF TUG FOR INDEMNITY.

A French bark having taken on her cargo at Tacoma, with which port her officers were unacquainted, employed respondents who were engaged in the towage and pilotage business to tow her to an anchorage in the harbor. A fog settled down after they started and respondents' tug anchored the bark in a part of the harbor where such anchorage was prohibited by the local regulations without a permit from the harbor master which was not obtained. The officers of the bark had no knowledge of such regulation, and she remained there until the evening of the following day when a steamer leaving the port, the weather being then foggy, came into collision with her and was injured. The owners of the steamer brought suit and recovered half damages, the bark being held in fault and liable for anchoring in the fairway in violation of the regulations. Respondents were notified of the suit and requested to defend, but did not, and the owners of the bark paid the damages adjudged against her, and brought suit against respondents for indemnity. *Held*, that it was the duty of respondents to anchor the bark in a lawful place, and their negligence in failing to do so having been the ground of the recovery against her they were liable over for the amount of the damages paid by her, the

---

*For other cases see same topic & § NUMBER in Dec. & Am., Digs. 1907 to date, & Rep'r Indexes

disbursements and proctor's fees paid, and also for demurrage for the time she was necessarily delayed by the suit, to be computed at the rate stipulated for in the charter under which she was operating in the absence of other evidence.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by Compagnie de Navigation Française, as owner of the French bark Amiral Cecille, against Thomas S. Burley and Robert McCullough, doing business under the firm name of the Tacoma Tug & Barge Company. Decree for libelant.

Hughes, McMicken, Dovell & Ramsey, for libelant.
James M. Ashton, for respondents.

DONWORTH, District Judge. On the evening of November 9, 1904, during a heavy fog the French bark Amiral Cecille, lying at anchor in Tacoma Harbor was struck by the steamer Multnomah which had just left her berth at Tacoma bound for Seattle on one of her regular trips. The Multnomah suffered damage but the bark was uninjured. On a libel filed in this court by the owner of the Multnomah against the bark, Judge Hanford decided both vessels to be at fault, the Multnomah in failing to steer with proper care and in failing in other respects to exercise the vigilance demanded by the existing circumstances, and the bark by reason of the fact that she was anchored without a written permit from the harbor master, in a location where such anchoring was prohibited by city ordinance. The damages were accordingly divided, and a decree for one-half damages and one-half costs in favor of the owner of the Multnomah was entered against the bark. The Amiral Cecille (D. C.) 134 Fed. 673. In holding the bark at fault, Judge Hanford said (134 Fed 676):

"The evidence introduced in behalf of the respondent locates the bark at the time of the collision approximately 400 feet from the place indicated by 'H. 2' upon libelant's Exhibit 1. Both locations are unnecessarily near to the track of vessels entering and leaving the waterway, and this is so because there is in the harbor of Tacoma an abundance of room for anchorage at a safe distance from the track of vessels coming into and leaving the wharves and docks: and the circumstances above narrated do not, in my opinion, afford a reasonable excuse for the action of the tugboat manager in anchoring the bark within the prohibited zone. He knowingly violated a reasonable regulation prescribed by lawful authority, and for the consequences of his act while in the service of the bark as a local pilot the bark is liable to respond in damages. The Robert Rickmers (D. C.) 131 Fed. 638. There is no probability whatever that the accident would have happened if the ordinance had not been violated by anchoring the bark in that part of the harbor which I have referred to as the prohibited zone. It is true, that if a permit had been applied for, it might have been granted by the harbor master; but it is not fair to assume that he would have granted such an application, and it is sufficient for the purpose of this case to find that the permit was not obtained, and without it the bark was prohibited from anchoring at the place where she was anchored. It is my opinion that the mere failure of the harbor master to exert his authority to enforce the city ordinance is not the equivalent of a permit in writing, and does not condone the offense. * * * In the case of The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, the Supreme Court declared the law as follows: 'But when, as in this case, a ship at the time of a

collision is in actual violation of a statutory rule intended to prevent colli-
sions, it is no more than a reasonable presumption that the fault, if not the
sole cause, was at least a contributing cause of the disaster. In such cases
the burden rests upon the ship of showing not merely that her fault might
not have been one of the causes, or that it probably was not, but that it could
not have been. Such a rule is necessary to enforce obedience to the mandate
of the statute.' This was repeated and declared to be the settled rule in col-
lision cases by the Supreme Court in Richelieu Nav. Co. v. Boston Ins. Co.,
136 U. S. 422, 10 Sup. Ct. 934, 34 L. Ed. 398. The same rule was again reit-
erated in the case of Belden v. Chase, 150 U. S. 699, 14 Sup. Ct. 264, 37 L. Ed.
1218. And in the case of the United States v. St. Louis & Miss. Transporta-
tion Co., 184 U. S. 255, 22 Sup. Ct. 350, 46 L. Ed. 520, the Supreme Court held
that local harbor regulations are necessary aids to commerce, and must be
obeyed, like other statutory requirements, and that, where a vessel 'anchors
in an unlawful position, or fails to observe the statutory requirements and
such other precautions as good seamanship would suggest, it must suffer the
consequences attending a violation of the law.' In this the court quotes with
approval Spencer on Marine Collisions, §§ 99, 106.''

Capt. Burley, one of the respondents here, was the tug boat man-
ager and pilot under whose guidance the bark was towed and an-
chored on the occasion in question. The present libel, filed by the
owner of the bark charges the respondents (who were copartners,
jointly engaged in the business of harbor towage and pilotage) with
violation of duty in negligently and wrongfully causing the bark to
be anchored in the fairway directly in the course of vessels bound in
and out of Tacoma Harbor and at a point forbidden to be used for
anchorage of vessels by the city ordinance, alleges the proceedings
in the former suit, and seeks to recover from respondents the amount
paid by libelant in discharge of the decree in that cause, together with
certain sums expended for proctors' fees and costs in defending the
same, and also damages for the detention of the bark caused by the
litigation.

During the progress of the former suit the present libelant served
notice upon the present respondents of the pendency thereof and the
nature of the claim asserted by the owner of the Multnomah, and
called upon respondents to make defense, stating that the libelant
would look to them for reimbursement of any moneys which it should
be compelled to pay in consequence of the collision. Respondents
took no action in response to this notice. Libelant now asks that the
decision in the former case be held to be res judicata against respond-
ents on the ground that where a person is responsible over to another
for whatever may be justly recovered in a suit against such other, and
he is duly notified of the pendency of the suit, requested to defend
and given an opportunity to do so, the judgment therein, in the ab-
sence of fraud or collusion, will be conclusive in a subsequent suit
against him for indemnity. Under the authorities this contention must
be sustained. Robbins v. Chicago, 4 Wall. 657, 18 L. Ed. 427; Wash-
ington Gaslight Co. v. District of Columbia, 161 U. S. 316, 16 Sup.
Ct. 564, 40 L. Ed. 712. By stipulation of the parties, a great part
of the evidence taken in the former case has been made a part of the
record in this case, and there is also additional evidence not offered
before. Aside from the binding effect of the former decision, I fully
concur in the above-quoted conclusions expressed by Judge Hanford,

both as to the law and facts, so far as the issues in the two cases are the same.

The question of fact which is most seriously contested on the present hearing is whether at the time of the collision the bark was in the same place at which she dropped anchor by order of Capt. Burley the day before. On this point Judge Hanford found (134 Fed. 674):

"For the convenience of shipping, the city of Tacoma provided several buoys in the harbor for mooring ocean-going vessels, and the ordinance referred to contains a section authorizing ships to moor at said buoys by permission of the harbor master and upon payment of a fee of $10 for 15 days' use; one of said buoys, commonly called the 'government buoy' being situated within the zone in which vessels are prohibited from anchoring without a permit, and which, for convenience, will be hereafter referred to as the 'prohibited zone.' On the 9th day of November, 1904, the bark, having completed the taking on board of her cargo from her berth in the waterway was towed by a local tug to the place where she was anchored at the time of the collision on the evening of the following day, the towage service being performed under the personal direction of the manager of the tugboat company, and the bark dropped her anchor by his direction at a place selected by him within the prohibited zone near the location of the government buoy."

If the question whether the bark changed her location after anchoring and before the collision is still an open one, I have no hesitation in concluding that the weight of the evidence indicates that she did not. A number of witnesses so testify. The bark's log makes no mention of a dragging of the anchor or other change of location until after the collision. There is no claim of high wind or severe weather and no ground on which to base a finding that the bark's ground tackle was defective. Capt. Burley learned of the collision a day or two after it occurred and as the bark remained at Tacoma for a month thereafter, he could have investigated the condition of the bark's ground tackle and procured evidence to disprove the correctness of the log entries, if they were wrong. It must have been apparent to him, before he was given notice to defend the suit, that his action in anchoring the bark in that location was likely to become the ground of a claim against his firm. On the whole evidence it seems reasonable to conclude that Capt. Burley is mistaken in estimating the distance from the point where the anchor was dropped to the site of the government buoy (at or near which he found a pile driver grappling for the chains of the buoy which had broken its mooring and disappeared). The bark's log states that she anchored in 40 fathoms, while the evidence for respondents gives only 22 fathoms of water at the government buoy. If the log is correct, she must have anchored outside of the site of the buoy. Everything indicates that the mention of 40 fathoms in the log is a genuine entry made at the time. There is no dispute, but that the soundings taken from the vessel in the location which she occupied at the time of the collision, showed from 38 to 48 fathoms, depending upon the direction in which she was tailing. Her location was then approximately 700 feet outside of the position fixed by a number of respondents' witnesses as the site of the buoy, and I am of the opinion that if these witnesses are correct, she anchored at that distance rather than within 200 feet as estimated by Capt. Burley. However that may be, it is not disputed

that the vessel was anchored within the limits of the zone prohibited by the ordinance and without a written permit from the harbor master, and it was on that ground that she was held liable by the court. I find nothing in the evidence which would justify me in holding that the officers or crew of the vessel committed any fault which contributed to the collision.

The respondents had been engaged for several years in the towage and pilotage business at Tacoma, and had towed to anchorage 99 per cent. of the vessels going out of the harbor. They did not usually tow or pilot ships to sea, but took them to anchorage in the harbor where they remained until taken in tow by a sea-going tug. This was the function for which respondents were employed by the Amiral Cecille. A dense fog having settled down shortly after Capt. Burley started with the bark, he concluded that he could not safely take her to the usual anchorage across the bay which he had in mind at the time of starting. He defends his action in anchoring at a location prohibited by the ordinance on the ground that it was dangerous to navigate in the fog, as the bark might collide with vessels at anchor or moored in that part of the harbor extending toward the anchorage grounds. It is urged that he acted under necessity and in extremis. But even if it be conceded that he was justified in temporarily anchoring the bark, he was not justified in assuming that his employment and duty then terminated. Having a business engagement down the sound, he left Tacoma within a few hours after anchoring the bark and was absent several days. On the day following the anchoring the fog lifted for an hour or two about noon, and during that time it would have been possible to remove the bark from her unlawful location. The officers of the bark, however, were at no time told by Capt. Burley that he considered the action which he had taken as one of necessity. He did not inform them of the ordinance or of any other fact which would lead them to conclude that their position was in any way dangerous or that they were not at the usual harbor anchorage for which they started. The second mate was the only person on board who spoke or understood both English and French and his knowledge of English was limited. The officers had a right to rely upon the services of Capt. Burley for getting the bark to a safe and lawful anchorage. The language of the Circuit Court of Appeals of this circuit in a case involving the same principle is in point:

"The master of the tug undertook a certain towage service. He was prevented from the continuous performance of that service by the condition of the tide. But the duty of the tug to the schooner was a continuous one from the time when she was taken in tow until the completion of the towage contract. The tug's duty did not end with letting go the tow line at the anchorage grounds. Its obligation of reasonable care continued at least until the schooner was safely anchored." The Printer, 164 Fed. 314, 90 C. C. A. 246.

A harbor pilot is selected largely on account of his personal knowledge of the local conditions affecting the safety of the vessel. He must be familiar with all such conditions. He must not only remember and avoid all the dangers of a physical nature, but he must also know and observe all the lawful regulations of the local authorities affecting the conduct of the ship. In commenting upon the duties

of river and harbor pilots, Mr. Justice Miller, speaking for the court in Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619, says:

"It may be said that this is exacting a very high order of ability in a pilot. But when we consider the value of the lives and property committed to their control (for in this they are absolute masters) the high compensation they receive, and the care which Congress has taken to secure by rigid and frequent examinations and renewal of licenses this very class of skill, we do not think we fix the standard too high."

If, through the negligence of the pilot the ship suffer loss, either directly or because it commits injury to others, the pilot is liable for indemnity. Wilson v. Charleston Pilot Association (D. C.) 57 Fed. 227; Donald v. Guy (D. C.) 127 Fed. 229.

It is admitted that the present libelant paid into the registry of the court on May 8, 1907, the sum of $4,339.90 in satisfaction of the decree against the Amiral Cecille and incurred further taxable costs in defending the former suit amounting to $670.02; also that it paid out $1,000 for proctors' fees in that suit. It is clear that these amounts are recoverable against respondents. The authorities cited by counsel for respondents against the allowance of proctors' or attorneys' fees are not in point where they have been incurred in another suit, and their recovery is sought as damages against one who is liable over. N. Y. State Ins. Co. v. Protection Ins. Co., Fed. Cas. No. 10,216; 8 Am. & Eng. Enc. Law (2d Ed.) 674. Referring to the damages claimed for 30 days' detention of the ship by reason of the admiralty proceedings against her, the record shows an agreement of counsel to the effect that the French consul at Seattle shall be considered as having testified "that the master of the Amiral Cecille was unacquainted in this port, and the ship and its owners had no agents or factors at any American port; that it was necessary to communicate with the owners and with the French and English insurers, which communications were carried on by the French consul and covered a period of 30 days before the necessary arrangements could be made and security furnished to enable the owners to obtain release of the vessel; and that the ship was detained by the marshal, and unable to depart until after the furnishing of such security." There is no evidence in any way tending to qualify or rebut this statement. While a detention for 30 days seems entirely unnecessary in these days of almost instantaneous communication throughout the important cities and ports of the world, I feel bound by this evidence to hold that the libeling of Amiral Cecille by the owners of the Multnomah necessarily caused a detention of 30 days. The bark's tonnage is 1,874 and the charter party under which she was working at the time provided for demurrage at three pence per registered ton per day. The demurrage for 30 days would amount to $3,422.39. In stating the effect of such a stipulation in a charter party as bearing upon the damages recoverable for the ship's detention, the Circuit Court of Appeals of this circuit has said:

"Conceding that it may not be conclusive in all cases, it nevertheless makes out a prima facie case, which, in the absence of any proof to the contrary, justifies the rendition of a decree in accordance therewith." The Columbia, 109 Fed. 669, 48 C. C. A. 596.

Here there is no evidence other than the stipulation of the charter party as to the actual loss which the owners sustained by reason of the detention. The amount stipulated in the charter party is therefore the only basis on which the court can act. It follows that libelant is entitled to recover the several amounts hereinbefore stated, aggregating $9,432.31. It is not clear under the circumstances of the case whether libelant should recover interest on any part of this award. "Whether interest on damages ought to be allowed depends upon the circumstances of each case and rests, very much in the discretion of the tribunal, which has to pass upon the subject, whether it be a court or jury." The Scotland, 118 U. S. 507, 6 Sup. Ct. 1174, 30 L. Ed. 153; Lincoln v. Claflin, 7 Wall. 132, 19 L. Ed. 106.

As to whether interest in any amount will be allowed to libelant the parties will be heard at the time of the presentation of the decree for signature.

NOTE.—After the filing of this opinion, the respondents applied for and obtained leave to submit further proofs relating to the length of time for which demurrage should be allowed and the actual loss sustained by the bark's detention. On a subsequent hearing the foregoing decision was modified in this respect, and the damages for detention limited to five days.