**AVILA et al.**

v.

**THE MADONNA DI TRAPANI et al.**

No. 54-28-A.

United States District Court, D. Massachusetts.

June 18, 1954.

---

25. See Kirschner v. New Home S. M. Co., 135 N.Y. 182, 189, 31 N.E. 1104.

Solomon Rosenberg, New Bedford, Mass., for plaintiff.

Thomas H. Walsh, Boston, Mass., for respondent-owner, Accursia Lucy Sutera.

ALDRICH, District Judge.

This is a libel for collision. The following facts were agreed, or, at least, were not substantially disputed.

About 1:00 A. M. on Monday, May 3, 1954 the single screw fishing vessel Jennie M. was proceeding out of New Bedford in a general southerly direction from Quick's Hole to No Mans Land, bound for the fishing grounds. Ahead of her was the Rose Jarvis, whose master was a part owner of the Jennie M., and whom she was following. The Jennie M. was 44 feet long and powered with 80 horsepower. She was making about 7 knots.

The Madonna di Trapani, a single screw fishing vessel 57 feet long, powered with 135 horsepower, was returning from the fishing grounds bound for Quick's Hole on roughly the opposite course from the Jennie M. She had 55,000 pounds of fish aboard.

The night was dark, the weather good, the sea calm, and visibility good so far as lights were concerned. There was a strong westerly tide in the Sound.

Somewhere in the vicinity of Devils Bridge white flashing gong buoy No. 29 off Gay Head the bow of the Madonna struck the starboard side of the Jennie M. The exact location, whether north or south of the buoy, is in dispute, but in any event it was within inland waters. Both vessels were carrying proper running lights. Neither had a lookout and neither sounded any signals.

The Madonna suffered only superficial injuries. The Jennie M., which was double planked on the starboard side, had her rail and planking driven in and several ribs broken, and suffered internal injuries right through to the port side. Most of the damage was above the water line, and although she took considerable water, she was brought back to New Bedford by the Rose Jarvis.

Gilbert Avila, master and part owner of the Jennie M., testified that he turned the vessel over to Joseph Amaral at Quick's Hole and went below. He instructed him to run SSW to "the Devils Bridge buoy". From there he was to run due south for 10 minutes, and then SSE to No Mans. There were two buoys off Devils Bridge,—a flashing gong buoy No. 29, and a can buoy ½ mile east of the gong. In view of the darkness of the night it might have been more likely to expect to run for the flasher, but on cross-examination Avila stated he said to run for the can. Also, he instructed Amaral to call him if he did not find the buoy after running his time out. Since the flasher was clearly visible at all times,

this instruction tends to confirm that the can buoy, the shorter route, was the destination. Furthermore, Amaral supported Avila's testimony that he was to run SSW, which he stated was Avila's customary course. The course from Quick's Hole to the can buoy was in fact SSW, assuming no allowance was made for the tide. In the light of the testimony that SSW was the customary course, I find that no allowance was made for the tide that night, and I find all of the above testimony of Avila and Amaral to be true.

In the light of the existence of the strong westerly tide testified to by one of the libellants' witnesses, it was to be expected that the Jennie M. would be carried over towards the gong buoy, and in fact she was. Amaral did not discover this fact until fairly close to. Shortly prior to this he saw the Madonna making up towards the buoy from the south, but he observed this only because the Madonna put her searchlight on the Rose Jarvis and subsequently swung it across him. At this time the Madonna was slightly less than ½ mile away, but Amaral saw none of her running lights although libellants' other witnesses testified, and I find, that all of her lights were lit.

There is a sharp discrepancy in the testimony as to what occurred after this. According to Amaral the Madonna employed her searchlight on two separate occasions, turning it on him only the second time; that immediately after the second flash was extinguished he saw the Madonna's green light only three seconds away; that he was on a southerly course which he held, but the Madonna ran straight into him, ramming him amidships on a southeasterly or easterly course.

In view of the fact that at least until this point the Madonna, according to all other witnesses on both sides who observed her, was proceeding in a general northerly direction, it is hard to believe that she would have turned sharply and headed straight for a vessel which she held in the path of her searchlight. There would be no reason for taking a southeasterly course, as the course from the buoy to Quick's, if the collision occurred north of the buoy, was NNE ½ E, and if it occurred south of the buoy, as libellants claim, her course was between north and NNW.

A witness for libellants testified that it required both hands to operate the Madonna's searchlight, suggesting that the Madonna made the swing involuntarily while the light was being operated. However, libellants' witnesses also testified that the day after the collision the crew of the Madonna made oral admissions to the effect that her wheel had been put hard over. These admissions were denied. They are most improbable. No reason for putting the wheel hard over suggests itself. The inconsistency of the libellants' two explanations for the Madonna's unusual course is also apparent.

Antone Ponte, the helmsman on the Madonna, testified that at the time he put his searchlight on the Rose Jarvis he was approaching the gong buoy from the south; that the Rose Jarvis was inshore from the buoy on his starboard hand; that he swung his light, picking up the Jennie M., and the buoy, ahead; that he then put his light out and did not use it again; that just before reaching the buoy he set his course for Quick's Hole, leaving the buoy close aboard to port, and putting the Jennie M. on his port bow; that the Jennie M. was one or two minutes away and continued to approach red to red, that suddenly the Jennie M. turned towards him, showing both lights and continued to turn, cutting across his bow; that he threw out his clutch and tried to swing away, but could not avoid ramming her amidships.

In endeavoring to determine the credibility of these two conflicting accounts, the court is impressed not only with unreasonableness of the Madonna's turning perhaps twelve points into a vessel held in the beam of her searchlight, the Jennie M.'s account, but even more with the fact that while the Rose Jarvis testified that the Madonna's searchlight blinded her, there was no such testimony from

the helmsman of the Jennie M. Instead, Amaral testified that while the Madonna held him in the beam of its light until three seconds before the collision, it was during this final three seconds that he saw the Madonna's green light. It was conceded that the Madonna's searchlight was a somewhat powerful one. It would seem to the court questionable whether a green light could have been seen under such circumstances. Moreover, it is almost inconceivable that Amaral's most vivid recollection would not have been of being blinded, if the light was on him until three seconds before the collision. Instead, he did not mention it. I find that Ponte's testimony that he used the light only once, and that it was extinguished one to two minutes before the collision, was the fact.

On Amaral's own admission his prior view of the Madonna was when she put her light on the Rose Jarvis and himself, and he never saw her range lights. Three seconds before the collision he saw her green light. Except for this position in extremis he was unable to identify with any accuracy the location of the Madonna at any time, whether 1, 2, or 4 points off his bow. In view of this the court finds that Amaral was paying entirely inadequate attention outside of his pilot house; that he did not notice that he was being set down on the gong buoy away from the can until he had almost reached it; and that in particular, although he saw the Madonna somewhere up ahead when she put her searchlight on the Rose Jarvis, he paid no further attention to her actions or course. I further find that when he discovered himself to have been carried over to the gong buoy he swung over hard to get back to the course closer to shore being taken by the Rose Jarvis whom he was following; that he made this maneuver without noticing the Madonna on his port bow, cutting across her bow at such close quarters that it was impossible to avoid a collision.

■ I find and rule that the Jennie M. was seriously at fault.

■ The question arises as to the fault of the Madonna. The use of the searchlight by the Madonna "for curiosity" was a fault. Pilot Rules for Inland Waters, Sec. 80.34. In view of the findings that this was one to two minutes before the collision, and the testimony of the libellants' witness on the Rose Jarvis, much closer than the Jennie M., that the blinding after-effect lasted about 20 seconds, and in view of the fact that the use of the searchlight served to indicate the position of the Madonna to the Jennie M., rather than to confuse her, I find that this fault did not contribute in any way to the collision. The Lehigh, D.C.W.D.N.Y., 12 F.Supp. 75.

■ The Madonna was also at fault for not keeping a look-out. Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603. In view of the fact that the Madonna was at all times aware of the position of the Jennie M., and would not have collided unless the Jennie M., which had her in plain view, had made an unannounced and doubtlessly unexpected shift of course, after which it was too late to do anything, I find that this fault also did not contribute to the accident. The Lehigh, supra.

■ There remains the question of the failure of the Madonna to sound passing signals. Her testimony was, and I find, that until the Jennie M. finally turned they were approaching red to red, and further suggests that the Jennie M.'s green light was not visible. In that event there would be no duty on the part of the Madonna to signal. Article 18, 33 U.S. C.A. § 203. I am not satisfied, however, that the courses of the two vessels, which were essentially parallel, were that far apart. However, I believe they were enough apart so that the Madonna's intention to pass to port was sufficiently apparent so as not to make the failure to signal a contributing fault. No collision would have occurred if the Jennie M. had held her course. The fact that she was, unforseeably, completely unaware of the Madonna, so that the Madonna's signal,

if given, would, as it happened, have served to alert the Jennie M. to her presence, as distinguished from her intentions, does not, under the circumstances, render her failure to signal a contributing fault. National Bulk Carriers, Inc., v. U. S., 2 Cir., 183 F.2d 405, certiorari denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631.

I find no fault on the part of the Madonna in not sounding danger signals. The Jennie M. was small and light, and turned too quickly for there to be time.

In view of the serious faults of the Jennie M. I rule that the misconduct of the Madonna was insufficient to call for a division of the damages. The M. J. Rudolph, 2 Cir., 292 F. 740.

A decree may be entered dismissing the libel.