Order may be drawn in accordance with this opinion.

**ESSEX COUNTY ELECTRIC COMPANY**
v.
**MOTOR SHIP GODAFOSS.**
No. 54–22.

United States District Court,
D. Massachusetts.
April 1, 1955.

William J. MacInnis, Robert M. Mac-Innis, Gloucester, Mass., Charles S. Bolster, Boston, Mass., for plaintiff.

Kirlin, Campbell & Keating, New York City, for defendant.

ALDRICH, District Judge.

On April 7, 1954 the M. V. Godafoss entered the inner harbor at Gloucester, Massachusetts under her own power, proceeding northeastward past Nun 14 off Rocky Neck until she had passed the entrance of Smith Cove and reached a point about opposite the chimney behind the Gorton-Pew Pier on the Gloucester side. At this point she swung 90° and proceeded in the direction of the pier, intending to make another 90° turn around Nun 16. When, with her engine in reverse, she failed to negotiate this second turn which, I find, was due to the effect of the propeller stream and drag in the very shoal water, she dropped her starboard anchor to hold her bow and cause a swing. This maneuver was successful, but when the anchor broke water there was found entwined in it an electric cable belonging to the libellant. Thereafter the cable parted. The stipulated damage to the cable for which this proceeding in rem was brought was

$9,907.61. The Godafoss is a single screw vessel of 2400 gross tons, 295′ in length, with a beam of 46′. At the time in question she was drawing 20′, and the shoal spot to which I referred was carrying no more than 22′ of water.

Although none of the officers of the vessel had been in Gloucester Harbor, she was in charge of a Captain Martin, a local master mariner who had held a pilot's license for Gloucester for 38 years, and had been deputy pilot commissioner for that district for 25 years. Captain Martin testified that he was well aware of the adverse effect of a shoal on the maneuverability of the vessel. There was no testimony, nor any explanation offered in argument, as to why he took her in the poorer water instead of proceeding down the middle of the channel, where there were several more feet, and where no right angle turns would have been needed. I infer from an examination of the chart that while there were shore marks which would have permitted the latter course there were other marks which made the course actually taken somewhat easier. Also, the deeper water favored slightly the port side of the harbor, so that there might have been interference with vessels coming out, had there been any. However, it is admitted that there were none. Captain Martin testified that he took the course he did because it was his usual one. I do not believe he gave consideration to the fact that the draft of his vessel might have suggested the wisdom of an exception in this case. I find that there would have been no occasion for maneuvering with the anchor had he followed the deeper and straighter course, and that if he is to be charged with knowledge of the existence of the cable the course he took was negligent. Claimant does not contend, and I do not find, that there was any vis major.

Captain Martin testified, and I find, that he had no knowledge of the existence of libellant's cable. It is conceded that the harbor chart published by the Coast and Geodetic Survey gave no indication of a cable crossing in this area, and that there were no warning signs on either shore. I further find that no part of the cable was visible, the portion that crossed the tidal flats having been covered with mud for many years. Libellant contends, however, that Captain Martin had constructive notice by virtue of certain government records, or otherwise.

In November 1937 libellant's predecessor in title made application to the Massachusetts Department of Public Works for a license to lay a cable. Notice required by Mass. G.L.(Ter.Ed.) c. 91, §§ 14–18, was given, a hearing was held the following month and the license was issued. In December an application was made to the United States District Engineer and after further public notices a hearing was duly held and the license issued. In the District Engineer's office of Boston there had been a record since 1939 that the cable installation had been completed on August 17, 1938. Both of these places showed the proposed location of the cable.

Captain Martin testified that while he was aware of the existence of provisions in the Massachusetts General Laws with relation to waterways, he had never read them; that he had never been to the Department of Public Works, or examined any records at the office of the District Engineer. He testified that he relied entirely for his knowledge upon Notices to Mariners. Notices to Mariners contain only contemporary changes and no current or recent issue would have referred to a cable laid in 1938. While he did not so testify, I assume that he also relied on government charts. I will not assume, however, in the absence of any evidence, that he did anything further, even to the extent of making inquiry of a late friend of his who operated a tug in Gloucester Harbor up to 1941 when he became actively engaged as a harbor pilot.

The reason that a vessel employs a pilot, and apparently claimant's vessel was one legally obligated to do so, Mass. G.L.(Ter.Ed.) c. 103, § 28, is in large measure because such an individual is expected to have local knowledge. Any

competent navigator can read a chart and subscribe to Notices to Mariners. As the Supreme Court said many years ago in Atlee v. Packet Company, 21 Wall. 389, at 396–397, 22 L.Ed. 619,

"The harbor pilot is selected for his personal knowledge of the topography through which he steers his vessel. * * * He must know where the navigable channel is. * * He must also be familiar with all dangers that are permanently located in the course * * * He must be constantly informed of changes * * * made by the hand of man or the action of the elements in the path of his vessel. A year's absence from the scene impairs his capacity. * * He should make * * * trips * * in company with other pilots more recently familiar * * *

"It may be said that this is exacting a very high order of ability in a pilot. * * * We do not think we fix the standard too high."

■ This salutary principle has not diminshed simply because better charts may be available today than there were 75 years ago. On the contrary, a pilot is still expected to have local knowledge, and he is not doing his duty if he relies merely on outward appearances and on government charts available to anyone.

■ "A harbor pilot is selected largely on account of his personal knowledge of the local conditions". Compagnie de Navigation Francaise v. Burley, D.C. Wash., 183 F. 166, 170, affirmed, 9 Cir., 194 F. 335. "He is chargeable with notice of * * * conditions, either in channels or harbors, if means of knowledge exist and are available to him." Great Lakes Towing Co. v. Alva S.S. Co., 7 Cir., 261 F. 261, 262.

■ The question, of course, is what is reasonable investigation. If Captain Martin had testified to some investigation, and to attempts by him to obtain all possible local knowledge, but that these efforts had been unsuccessful, that would have been one thing, but in the absence of any inquiry by him at all I will be slow to assume that it might have been possible to have made inquiry without such inquiry bearing fruit. Where it appears that he made no inquiry whatever I feel there is a burden on him to establish affirmatively that even if he had made inquiry it would not have been productive. "It is no excuse for the failure to make any inquiry that such an investigation, if made, might have failed to develop the truth." Geyser-Marion Gold Mining Co. v. Stark, 8 Cir., 106 F. 558, 563. At least this is so when the evidence shows that there was one public source which would have fully apprised him of the existence of the cable, and another that would at least have put him on notice of the likelihood of its existence.

■ Since 1796 a local pilot has been charged by law for all damages due to negligence and unskillfulness, and unlicensed persons acting as pilots are criminally liable. Mass.G.L.(Ter.Ed.) c. 103, §§ 18, 35. I hold that such skillfulness requires a high degree of knowledge predicated on special training and inquiry, and not casual competence. I therefore charge the vessel with negligence on the part of its pilot.

■ Libellant makes a further claim with regard to negligence, namely, that after the cable was discovered on the anchor no steps were taken to free it before it parted. This fact is true. However, I will not find it operative negligence in the absence of evidence that there were any feasible steps which could have prevented the severing. Libellant did not suggest by evidence, expert or otherwise, or even by argument, what the vessel might have done once the situation had developed. For the size of the vessel the water was poor and space was limited. There were obstructions on both sides, and to leeward there were valuable docks at which I assume vessels may have been moored. There was a 10–14 knot wind, and the Godafoss did not have steerage way unless she was making about 3 knots. While I might speculate that the anchor and all the chain might have been let go had the

master acted more promptly, instead of arguing at the bridge whether this was a cable, or only a discarded trawl wire, which I cannot imagine it looked like, I think it would be presumptuous of me to find as a fact in the absence of any evidence, that this or any other action would have been beneficial, or even feasible. Accordingly, I find no new negligence after the cable was discovered.

██ I turn now to claimant's charge that libellant was negligent in not taking steps to warn the public of the presence of the cable. This could have been done by the erection of signs. Libellant might also have endeavored to persuade the government to mark the cable area on the chart. In Gloucester Harbor alone there are two other cable areas and a pipe line area so marked. This question gives me but little difficulty. It is quite customary, as counsel agreed, to erect cable warnings on the shore. It does not seem to me that it is an answer, particularly in a harbor where the dropping of anchors in emergencies or otherwise might well be expected, to say that there is no statutory requirement of notice. Neither is it any answer to say that the government might have refused to mark the area on the chart when it does not appear that libellant ever requested it to do so. I hold libellant at fault, even though the cable was in a position where it was legally entitled to be. The Georgie, 9 Cir., 14 F.2d 98; The Steam Dredge No. 6, D.C., S.D.N.Y., 222 F. 576, affirmed on other grounds, 2 Cir., 241 F. 69, certiorari denied Standard Gas Light Co. v. R. G. Packard Co., 244 U.S. 659, 37 S.Ct. 745, 61 L.Ed. 1375. The fact that the cable was imbedded 3′ in what seems to have been very soft mud clearly did not put it out of the reach of anchors, even of less weight than this one.

██ There remains libellant's contention that the vessel's conduct amounted to such gross negligence as to limit the rule of The Pennsylvania, as last done in this court in Avila v. The Madonna Di Trapani, D.C.D.Mass., 122 F.Supp. 272; see Seaboard Tug & Barge v. Rederi Ab/Disa, 1 Cir., 213 F.2d 772. What might have been gross negligence if Captain Martin actually knew of the cable so as to obviate the divided damages rule, does not, I feel, have that effect when clearly but for libellant's negligence he would then have known of its presence and been able to avoid doing what he did. This seems to me exactly the case where I should not make the exception recognized in these other cases.

A decree will be entered for the libellant for one half of the damages, with interest and costs.