THE VERA.

THE MELROSE.

(District Court, D. Massachusetts. September 14, 1912. On Settlement of Decree, March 5, 1914.)

Nos. 260, 317, 318, 360.

1. COLLISION ⊚⟞69—STEAM VESSELS MEETING—NARROW CHANNEL RULE.

The steamship Vera passing out from Boston Harbor in the evening came into collision in the channel with the meeting steamship Melrose, and almost immediately afterward with the anchored schooner Baxter. The steamships had agreed by signal to pass port to port. *Held*, on conflicting evidence, that the first collision took place on the Vera's side of the channel and within 500 feet of the schooner, and that the Vera was not in fault for either collision, the second having resulted from the first before the master could get her under control and change the course into which she was deflected thereby; that the Melrose was in fault for both collisions for being on the wrong side of the channel and out of her proper course and for failing to take seasonable and sufficient measures to carry out the passing agreement; that the Baxter was also in fault for both collisions for anchoring too near the channel courses where she interfered with the maneuvers of the other vessels, and outside of the limits prescribed by the harbor master.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. ⊚⟞69.]

2. COLLISION ⊚⟞74—ANCHORED VESSEL—IMPROPER PLACE OF ANCHORAGE.

A vessel anchored in a harbor outside the limits prescribed by lawful authority is chargeable with a statutory fault, and in case of collision between other vessels has the burden of proving that her being where she was could not have contributed thereto.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 104; Dec. Dig. ⊚⟞74.]

3. COLLISION ⊚⟞90—PRESIDENT ROADS—"NARROW CHANNEL."

President Roads and its approaches are "narrow channels" within the meaning of Inland Navigation Rule 25 (Act June 7, 1897, c. 4, 30 Stat. 101 [Comp. St. 1913, § 7898]).

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 181–186, 196; Dec. Dig. ⊚⟞90.

For other definitions, see Words and Phrases, Second Series, Narrow Channel.]

On Settlement of Decree.

4. COLLISION ⊚⟞120—SUIT FOR DAMAGES—AMENDMENT OF PLEADINGS TO CONFORM TO FINDINGS.

In a suit for collision, respondent brought in, under Admiralty Rule 59, a third vessel, and her claimant filed a cross-libel against respondent, but not against libelant. There were two collisions, one resulting from the other, in which all three vessels suffered injury. On the hearing, libelant's vessel and the impleaded vessel were both held in fault for both collisions. *Held* that, since the bringing in by respondent of the impleaded vessel enabled libelant to recover half damages from her, she was entitled to recover half the amount of her own damage from libelant and to amend her pleadings accordingly.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 255; Dec. Dig. ⊚⟞120.]

In Admiralty. Suits for collision by W. Irving Pearce, owner of the schooner Malcolm Baxter, Jr., against the steamship Vera, the

⊚⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

steamship Melrose impleaded; by Dampskibs Actieselskabet International, owner of the steamship Vera, against W. Irving Pearce and others; same against the steamship Melrose; and by New England Coal & Coke Company, owner of the Melrose, against the Vera. Decree in favor of the Vera against both other vessels, and in favor of the Baxter against the Melrose, and of the Melrose against the Baxter each for half damages.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant Pearce.

Barry, Wainwright, Thacher & Symmers, of New York City, for libelant New England Coal & Coke Co.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for libelants Dampskibs Actieselskabet International et al.

DODGE, Circuit Judge. [1, 2] On January 18, 1910, the four-masted schooner Malcolm Baxter, Jr., entering Boston Harbor, with a cargo of coal on board, from Norfolk, anchored below Castle Island and to the north of Spectacle Island, between 5 and 6 o'clock in the afternoon. The wind at the time was moderate, from S. by W. to S. W. The tide had been ebbing since about 5 o'clock. After swinging to her anchor, the schooner headed in a southwesterly direction, the stern being toward the channel. She lay near the southerly side of the navigable channel up and down the harbor. Whether or not she in any respect obstructed that channel is a disputed question.

Not long afterward, and not far from 6 o'clock p. m., a collision occurred somewhat further up the channel between the Norwegian steamship Vera, outward bound from Boston, without cargo, and the American steamship Melrose, inward bound, with a cargo of coal; the port bow of the Melrose striking the port quarter of the Vera. Both vessels sustained some damage. The Vera, within two or three minutes after this collision, collided with the schooner, striking that vessel's starboard bow and inflicting damage, besides sustaining damage herself.

On January 20, 1910, the libel in the first of the above cases (No. 260) was filed by or on behalf of the schooner's owners against the Vera, claiming damages to the amount of about $3,000 alleged to be due to the Vera's sole fault. On April 7, 1910, this libel was amended so as to claim $4,250 instead of $3,000. On June 28, 1910, the Vera's master, having previously appeared as claimant, filed a petition under Rule 59, setting forth that the Melrose was wholly responsible for, or was contributory in fault with the schooner for, the collision between the Vera and the schooner, and asking for process against the Melrose under the rule, requiring her and all persons interested in her to answer the libel and petition. The Vera's answer was filed July 1, 1910. An answer to the libel on the Melrose's behalf was filed February 13, 1911, and to the petition February 15, 1911, at the hearing.

On June 30, 1910, the Vera's owner filed a cross-libel against the schooner's owners, alleging that the collision was due to the fault of

the schooner and of the Melrose, and claiming damages to the Vera to the amount of $7,000. An answer on the schooner's behalf was filed February 27, 1911, after the hearing had begun. This is the second of the above cases, No. 317.

Also, on June 30, 1910, the Vera's owner filed a libel against the Melrose, making the same allegations and claim as in No. 317. This libel was answered on the Melrose's behalf November 22, 1910. This is the third of the above cases, No. 318.

On November 21, 1910, the owner of the Melrose filed a libel against the Vera alleging the collision with the Melrose to have been caused by the Vera's sole fault and claiming damages to the amount of $5,000. An answer on the Vera's behalf was filed February 11, 1911, at the hearing. This is the last of the above cases, No. 360.

1. I first consider the question of fault arising between the Vera and Melrose for the first of the collisions above mentioned.

No claim is made by either of these vessels that the other was not carrying the lights required by law. According to the testimony from on board each, both sidelights of the other were seen, at one time or another, before the vessels collided. As the sun sets on January 18th considerably before 5 o'clock, and as the weather was somewhat overcast or cloudy, with occasional light snow, it was dark at the time, but there was nothing to obscure the lights, for the purposes of navigation. A moon, new January 11th according to the almanac, was occasionally visible.

The Vera was being navigated under the direction of Folger, a Boston pilot, who had held a full "branch" and been in constant service under it for 10 years on vessels entering or leaving Boston Harbor. He was on her bridge, 90–100 feet aft from the stem. With him there were Rynning, the Vera's master, and Nass, seaman, at the wheel. Stationed on lookout on the forecastle head was Gunderson, a seaman. Not far aft from him, on the forward part of the deck, were Johansen, carpenter, and Nielson, mate; both standing by for orders, but having no immediate duty. All these persons testified in person at the trial, and with Fremstadt, steward, who came on deck from below just before the collision and who also testified, were the eyewitnesses to the collision from on board the Vera. Frolang, the second engineer, who also testified, was below and did not see the collision.

The Melrose was being navigated, after passing Deer Island light, under the direction of her master, Frostead, who held an American master's license for ocean-going vessels; had had 14 years' experience as such master; had been licensed about three years for the waters around Boston, and had, during that time, commanded steamers employed in carrying coal from Baltimore or the Virginian loading ports to Boston. He was on the upper bridge, alone. On the lower bridge were McGray, chief officer, and Wallace, the second officer. Both bridges were some 160 feet aft from the stem. Aft of the lower bridge was the wheelhouse, wherein was a seaman at the wheel. Collard, another seaman, was on lookout in the crow's nest, on the foremast, about 100 feet aft from the stem and 35 feet above the deck. Frostead testified at the trial. The depositions of McGray, Wallace,

and Collard, taken before the trial began, were introduced. These persons, with Middleton, her chief engineer, who happened to be on deck and who testified at the trial, were all the eyewitnesses to the collision from on board the Melrose. Lord, first assistant engineer, who also testified, was in the engine room below.

The Vera was drawing 8 feet, 7 inches forward, and 12 feet, 5 inches aft. Her length was 222 and her beam 32 feet. The Melrose, a considerably larger vessel and of considerably deeper draft, was drawing 24 feet, 11 inches forward, and 25 feet, 8 inches aft. Her length was 400; her beam 52 feet.

According to the Vera's pleadings, the Melrose was first seen from on board her when she was about abreast of bell buoy 9 A. This is shown by the government charts to be a black bell buoy, having a black spar buoy near it, below Castle Island, on the southerly side (on starboard, to a vessel going down) of the narrow channel between President Roads and the inner harbor, and close to the entrance to that channel from the wider waters of President Roads. Nearly opposite to it, on the northerly side of the narrow channel entrance, is buoy No. 8, a red spar buoy. The distance between these buoys, which measures on the charts something over 1,600 feet, may be taken as the width of the channel at that point. About on the line between these buoys and in the channel lay the Eugene, a government dredge, whose location on January 18th has been fixed by the government engineers. Its distance from buoy 8, as indicated by them, measures on the charts a little over 400 feet, and from buoy 9 a little less than 1,200 feet.

The Vera's pleadings further allege that the Melrose's green light was the one first seen, about 1¼ miles away and about four points on the Vera's port bow. When the vessels were about three-quarters of a mile apart, the Melrose, still showing a green light on the Vera's port bow, blew one blast and was answered with one. Thereupon the Vera's wheel was ported, to keep her more on the starboard side of the channel and give the Melrose more room. She kept as far toward that side as she could and clear the sterns of certain schooners lying at anchor. Of these the Baxter was one, lying further down channel than the others, having her stern projecting further into or toward the channel than theirs, and so much further as to bring her directly ahead of the Vera. The Vera's engines were stopped on her account. When the two steamers were a short distance apart, the Melrose blew two blasts and for the first time showed her red light with her green. The Vera thereupon, as the only way to avoid the Melrose and the Baxter, put her helm hard to port and her engines full speed ahead. The Melrose thereupon blew three blasts, continued to approach, and ran into the Vera's port quarter some 20 feet from the taffrail. The Vera answered neither the two blasts nor the three blasts sounded by the Melrose.

The opposing account, given in the Melrose's pleadings, may be thus stated: Before arriving abreast of Spectacle Island lights on the south side and of Nun buoy 6 on the north side of President Roads, while having the City Point range lights open to the N. and the dredge Eugene on her starboard bow, and while running at half

speed, the Vera's red light was first seen above the dredge, and slightly broader than the dredge on the starboard bow. One blast was heard from the Vera and answered while the Vera was still above the dredge, by which time the Melrose had arrived abreast of Spectacle Island. Her helm was thereupon ported and she was headed for Castle Island. It was further ported and the dredge brought to bear about a point on the starboard bow. The Vera, instead of keeping on her own starboard side of the channel, entered the waters on the opposite side under a starboard helm, thus suddenly opening her green light and showing both lights when nearly ahead of the Melrose. Though the Melrose's engines were at once put full speed astern and her helm put hard aport, and though the Vera swung back to starboard under a port helm so as to shut out the green light she had shown, her port quarter swung against the Melrose's port bow.

The Melrose alleges the place of collision to have been about 1,000 feet S. E. by E. from the dredge. If there, it was on the N. E. side of the channel and of the upper range of lights on Spectacle Island. The Vera, denying that the place of collision was on the N. E. side of midchannel, alleges that it was not more than about her length from the schooner Baxter, with which she afterward collided, and which, as no one disputes, was, if in the channel at all, on its southerly side.

The two upper range lights on Spectacle Island are on a line running by compass nearly N. W. ¾ N. and S. E. ¾ S. This range is intended for and used as a guide to the proper course through the narrow channel out of which the Vera was coming, and for the entrance to which the Melrose was heading. An outward bound steamer coming down that channel, if following the range line exactly while in the channel, would not continue long upon it after passing between buoys 8 and 9, because of its direction crossing obliquely the direction of the regular courses followed by vessels from or to the entrance to the narrow channel through President Roads. To continue upon it for three-quarters of a mile (nautical) after passing the buoys would be to run ashore on Spectacle Island. About 2,100 feet below the buoys this range line intersects another line upon which two lights on City Point, South Boston, are in range. This line runs by compass nearly E. and W., is intended for and is used as a guide to the proper channel course through President Roads. At the point of intersection of the two ranges, the steamer above supposed, if following exactly the City Point range, would change her course to port between 3 and 4 points and follow the City Point range through President Roads until it intersected still another range of lights on Spectacle Island, indicating the proper course to and through Broad Sound.

The actual place of collision, if it can be determined from the evidence, will obviously go far to determine, as between the two conflicting accounts of the manner in which the two steamers approached each other, which is the true account.

Capt. Frostead, of the Melrose, as part of his redirect testimony, marked on a copy of Coast Survey Chart 246, initialed "W. B. and B.," the course he claims to have followed through President Roads,

from off Deer Island Light, to the place of collision. This place, as he explained in cross-examination, he meant to put about 900 feet from the dredge Eugene, about 500 feet N. of the upper Spectacle Island range line, and 800–1000 feet above the Baxter, supposing the latter to have been lying about 300 feet to the southward of the point where that range and the City Point range intersect. McGray, chief officer, gives in his deposition the same distance and bearing from the dredge as alleged in the pleadings, but he had made a sworn statement to the local inspectors on the day after the collision (January 19th), according to which the Melrose was nearing the dredge and about 600 feet from it at 5:58 p. m., her half speed toward it was not checked until 5:59 p. m., and collision followed at 6 p. m. Wallace, second officer, put the collision 1,200 feet from the dredge, Collard, lookout, at 900 feet, but neither undertook to give the dredge's bearing, and no other witness from the Melrose undertook to give either its distance or bearing. No careful observation or estimate of either, at the moment, was to be expected under the circumstances, nor, in undertaking to fix the point of collision by reference to the dredge, can I believe that the master and officers of the Melrose have relied so much upon observation or estimate, as upon inference from what they claim the Melrose's course, with reference to the ranges and the Vera's course, to have been during the approach of the two vessels. No witness from the Vera or from any other vessel in the vicinity has undertaken to fix the place of collision with reference to the dredge.

To fix the point of collision, as attempted in the Vera's pleadings, by reference to the Baxter as she lay at anchor, requires the Baxter's location to be first determined. Folger, the Boston pilot commanding the Vera, in his cross-examination, located the Baxter by a mark upon another copy of Chart 246, initialed "E. E. B.," intending, as he testified, to put her not far from the intersection of the two ranges referred to, about 100 feet to the S. or S. W. of that from Spectacle Island and about 300 feet to the S. of that from City Point. The pleadings and the testimony lead me to believe that this cannot be very far from the true location. The Melrose's pleadings allege that the Baxter lay close to the Spectacle Island range, but not how she lay with reference to the City Point range, nor do I find any testimony from on board the Melrose upon this point except McGray's, who says that "in reference to the City Point lights" she was "well over on the opposite of the channel from the side the Melrose was proceeding on" and not far from Spectacle Island range. The Baxter's earlier pleadings (libel in No. 260) allege her anchorage to have been "on" the Spectacle Island range and "somewhat south" of the City Point range—though her later pleadings (answer in No. 317) say to the "westward of" the first, and "well to the south" of the second. The Baxter's master, mate, and engineer gave their depositions before the trial, and were all the witnesses from on board her. Her master (libelant in No. 260) stated that the City Point range was "well open," and that she was 2–500 feet S. W. of the Spectacle Island range. Peterson, her mate, that she was 3–400 feet S. W. of that range and one-quarter of a mile S. of the City Point range. Mar-

cellus, her engineer, that she was 3–400 feet W. of the Spectacle Island range, but he could not tell how she lay as to the City Point range. There were three schooners anchored further to the westward than the Baxter. The Prescott Palmer seems to have lain nearest. Sudds, her steward, called on the Vera's behalf, said that she lay perhaps 200 feet inside the Spectacle Island range, that the Baxter was perhaps 400 feet southeast from her and somewhere near the ranges. Beal, mate of the Fannie Palmer, called on behalf of the Vera, said his vessel was lying 150 or 200 feet inside the Spectacle Island range, that the Baxter was nearer the channel and pretty near down on the range referred to. Cunningham, master of the tug Juno, astern of the Baxter at the time of the collision, and Bohld, mate of a third schooner anchored above the Fannie Palmer but on the same side of the channel, who happened to be on board the Juno, called as witnesses on behalf of the Melrose, put the Baxter no further away from either range than did Folger, if, indeed, their testimony does not tend to show that she was more nearly on one or both of the ranges. Ross, master of another tug which went to the Baxter after the Vera had been in collision with her, called on behalf of the Baxter, put her 6–700 feet inside the Spectacle Island range and inside also of the City Point range; but he does not undertake to say how much. I cannot believe his estimate any more likely to be nearer the truth than that of Folger. The five witnesses last above mentioned were the only witnesses from on board vessels not in either collision.

If my conclusion is right that the Baxter lay very nearly at the point indicated by Folger, she was, according to the charts, not less than 2,000 feet away from the dredge, considerably more than 1,000 feet from the point of collision indicated by Captain Frostead, and in a direction about S. by E. from the latter point. The next question is: How far was the point of collision between the two steamers from where the Baxter lay? Upon this question the various witnesses differ considerably, even those from the same vessel, and upon no one of their estimates by itself can full reliance be placed. From the Baxter herself, Marcellus, keeping watch on deck while the rest of her crew were below at supper, says the Vera was two ships' lengths away when he called the others out. He had been watching both steamers and called his crew when he first thought the Vera likely to hit the Baxter. Her master and mate, thus brought on deck, saw the Vera before she struck, 1,000 feet away according to the master, 5–600 feet away according to the mate. From the two steamers the testimony is as follows: On board the Melrose little attention seems to have been paid to the Baxter after passing her, and it is natural to suppose the attention of those in charge of her to have been directed in the opposite direction. Capt. Frostead undertook no estimate of the distance from any observation at the time of collision, but did say that the Baxter was 6–800 feet away, abeam, when he passed her, also that the Melrose would have gone 4–500 feet during the subsequent interval before the collision. McGray gave no estimate of the distance at the collision, but thought her 1,800 feet away when abeam. Wallace thought the Melrose "may have been" over 2,000 feet from the Baxter, but he did not see the collision and no weight

can be given to such a conjecture. Collard took no notice of the Baxter after passing her, and neither he nor Middleton undertook to estimate the distance. From the Vera, Folger put the collision with the Melrose 300 feet from the Baxter; Rynning, master, 3–400 feet; Nielson, mate, gave the same estimate; Gunderson, lookout, said the distance could not have been over two ships' lengths; Johansen, carpenter, three ships' lengths; Nass, at her wheel, one or two ships' lengths. All these witnesses had the Baxter in view ahead of them and were watching her as well as the Melrose. It is true as to all of them except Folger that they were more or less unfamiliar with English, and that the three last mentioned had to testify through an interpreter. All of them also, Folger included, may be supposed to incline toward estimates in the Vera's favor, upon this point as upon others; but their estimates do not greatly differ from two of the three from the Baxter herself, or from the estimates of witnesses from vessels not in either collision. From the Prescott Palmer, Sudds said he heard the collision, was then looking at the steamers, and that they were just astern of his vessel, 200 or 250 feet away. From the Fannie Palmer, Beal said he saw the collision and that the steamers were 300 feet from his vessel, not over 400 feet from the Baxter, and about halfway from where they would be astern of his vessel and where they would be astern of the Prescott Palmer. Capt. Ross' tug was above the dredge in the narrow channel when the steamers came together and did not see this collision happen. From the Juno, alongside the Baxter, Cunningham saw the collision and puts the steamers 500 feet from the Baxter at the time, or a little better. Bohld, also on the Juno, saw or heard the collision, but does not undertake to say how far it was from the Baxter.

Satisfied as I must be, for the reasons above stated, that the Melrose's witnesses have located the collision much nearer the dredge and much further N. than it really was, I am unable to believe, in view of all this evidence, that the steamers when in collision can have been much over 500 feet, if so much, above where the Baxter lay. This agrees with Captain Cunningham's estimate. A point about that distance from where she lay, measured in any direction which I can regard as representing the direction of the place of collision from the Baxter with any probability, could not be described as on the northerly side of the channel. If the course marked by Capt. Frostead represents the course which a vessel going up on the northerly side of the channel would take, such a point would lie very considerably further S. than any point in that course.

[3] President Roads and its approaches are no doubt to be regarded, generally speaking, as a "narrow channel," within the meaning of Rule 25. The Yarmouth (D. C.) 100 Fed. 667, 668. But below the entrance to the much narrower channel out of which the Vera had come there are no well defined limits at night, nor is it possible to say with much definiteness exactly where the southerly side of the channel is. No doubt for a deep draft vessel like the Melrose there is less width of navigable water than for a lighter vessel such as the Vera. The channel, for the purposes of such a question as this, would seem to have such width on the one side and on

the other of the regular course indicated by the ranges and followed up and down by vessels free to maneuver without regard to others, as would be reasonably necessary for ordinary purposes of safe navigation. Much of the evidence relied on to show that one or another of the vessels here in question was in the channel, or on one side or the other of it, has given me little or no assistance, for want of sufficient assurance that I understood what the witness had in mind in speaking of the "channel." If, however, the Vera had, as she claims, come down from the dredge, keeping the line of the upper range always on her port hand, and had reached the point of collision without any starboarding of her helm, or any change of direction except under a port helm, the direction of the range line obliquely across the channel, and the fact that the Baxter lay so near to the point where the channel course becomes more easterly in direction, seem to me to require the conclusion that at a point about 500 feet above where the Baxter lay she was neither on the northerly side of what can properly be described at that point as the channel nor in the middle of it, but considerably on the southerly side of midchannel. If therefore the courses followed by her to the point of collision were as she claims, she cannot be held in fault for violating Rule 25. Those courses could not have failed to carry her at a safe distance from the course on the opposite side indicated by Capt. Frostead on the chart.

Such were the courses the Vera did follow, unless the account coming from her is to be rejected and that coming from the Melrose accepted instead. The two cannot be reconciled. I must regard the unanimous testimony of the witnesses from the Vera, that she never crossed the range line after passing the dredge, that she departed from its direction only by going to starboard under a port helm, and at no time went to port under a starboard helm, as having the stronger claim to belief. These witnesses had the range lights in sight ahead and were navigating with reference to them. The Melrose witnesses had left them behind.

· The following considerations further confirm the account coming from the Vera: To reach the point of collision indicated by Capt. Frostead, the Vera must have gone to port under a starboard helm soon after passing the dredge. The further below the dredge, the greater would have been the change to port required. It is difficult to believe that a pilot of Folger's experience would make such a change, having on his port bow the green light of a steamer with which he had just exchanged whistle signals amounting to an agreement between the two vessels to pass each other port to port. That there had been such an agreement is undisputed. To my mind this fact forbids any conclusion that he had misunderstood the Melrose's bearing from his vessel or the direction in which she was bound. It is easier to suppose that the Melrose had miscalculated her true position in the channel, and brought about the collision by not going to starboard seasonably and sufficiently after the whistles were blown.

That one-blast signals had been thus exchanged being undisputed, it becomes of comparatively small consequence which vessel whistled first. But, since I have to choose between two irreconcilable accounts,

it is perhaps not without significance that Capt. Frostead himself supports the Vera's allegation that the Melrose whistled first. The contrary allegation that it was the Vera is supported only by McGray and Wallace from on board the Melrose, the other witnesses from on board her not undertaking to testify on the point. This discrepancy between Frostead and McGray appears in their reports to the local inspectors made the day after the collision.

The testimony from the Melrose that the Vera showed her green light just before the collision and immediately afterwards shut it out again, I am unable to accept, under the circumstances, as indicating changes of course on the Vera's part which the witnesses from her deny. The supposition that the Vera changed to port and back again to starboard within during the time which the Melrose's witnesses claim to have had her green light in view requires, under the circumstances, stronger evidence to support it against the testimony that no such change to port was made. It is not supported on the Melrose's part by the testimony of any stationed lookout on her bow. She had no stationed lookout further forward than Collard, on her foremast 100 feet aft of her stem.

If the place of collision was substantially as above found, and the account of the approach of the two steamers which comes from the Vera is the one established by the evidence, the collision was brought about by the Melrose's fault in not keeping on the proper side of the channel, and in failing to take seasonable and sufficient measures to carry out the agreement in which both vessels joined by the exchange of signals. There are in her own evidence indications that her change to port after the signals had been exchanged was at most slight. Her speed, claimed to have been reduced from half speed to slow when each vessel sounded one blast, was not altered until her engines were put at full speed astern because collision was imminent. I must hold that the dangerous proximity, which required emergency measures on the part of each vessel, had been brought about by the Melrose's neglect or miscalculation.

If I am right in the above conclusions, it is unnecessary to decide whether or not the Melrose gave a cross-signal of two blasts just before the collision, as all the witnesses from the Vera's deck testify. On the Melrose's part, those in charge of her navigation deny that such a signal was ever sounded, and there are other witnesses who say they heard no such signal. That, if two blasts were sounded, they were at once followed by three from the Melrose, is agreed. Such a signal would have been not improbable from the Melrose if the facts were as above found, nor can I believe the Vera's witnesses to be willfully falsifying in regard to it. On the other hand, confusion as to what they heard would not be impossible under the circumstances. But, if sounded at all, the two blasts were blown at a time when the fault which caused the collision had been committed.

The following claims of fault on the Vera's part are not disposed of by what has been said: (1) That, after the exchange of signals, she did not keep far enough to starboard under a port helm; (2) and failed to keep her course and speed; (3) that when she found collision imminent she failed to give a danger signal, stop, and back, but instead put

her helm hard aport and her engines full speed ahead, thereby throwing her stern nearer the approaching Melrose.

As to (1), in view of the fact that the Vera is shown to have had a group of not less than four anchored schooners on her starboard hand, whose precise position with reference to the channel and each other could not well have been determined while in the vicinity of the dredge, and because it follows from what has been found that the Vera had a right to expect a change to starboard on the Melrose's part so much greater than was made as to have prevented risk of collision when the vessels had reached that part of the channel where collision occurred, I do not think she can justly be held in fault for not keeping still further to starboard. If I am right in finding that she had yielded to the Melrose as much of the channel as compliance with the signals exchanged required, greater proximity to the anchored schooners involved risk which she had the right to avoid.

As to (2), no change of course made after the signals exchanged, which took either vessel further away from the other and from mid-channel, can be treated as a fault on her part. As to changes in speed, the Vera's was reduced from full to half speed when the signals were exchanged. Obviously the latter was the more prudent speed for a channel wherein not only the Melrose but anchored vessels, lying so near on her opposite side, were to be avoided. For a further change of speed to slow before the collision, under engines slowed and stopped, the reason given by the Vera's pilot is that her proximity to the Baxter, lying nearly ahead, had become such as to make it appear unsafe to reduce the distance faster than could be avoided before the Melrose had passed and the Vera was free to starboard her helm enough to clear the Baxter's stern. If the place of collision was so near the Baxter as I have thought, I must consider the reason assigned sufficient. If the requirements of the crossing rules, calling upon the privileged vessel to keep her course and speed, have any application to a situation like that existing between these two steamers after the exchange of signals, I think they must yield to special circumstances such as here appear. When she slowed, the Vera had still the right to expect from the Melrose a further change of course taking her clear on the Vera's port side. If it is claimed that, instead of slowing, the Vera's helm should then have been put hard aport and the attempt made to clear the Baxter by passing around her bow, I am unable to think that the situation, as it then presented itself, required of the Vera a departure from her intended course so extraordinary and subject to so much risk that she would have had to pass between the Baxter and the nearest of the other anchored vessels. If the Baxter's stern was about 300 feet from the upper range line, to clear her bow would require the Vera to get at least twice as far from that line, considering the Baxter's length (226 feet), not including her bowsprit and jibboom.

(3) The hard aport helm and full speed ahead ordered by the Vera's pilot was, if an error at all, an error in an emergency created by the Melrose's fault. It was an emergency measure, taken as a last resort as a possible chance of avoiding or lessening the damage to both vessels then imminent. If in any sense an error, I must regard it as an error in extremis.

Whether the collision happened some 500 feet northerly of the range line and some 1,000 feet away from the Baxter as the Melrose claims, or, as the Vera claims, on the other side of the range line, and very much nearer the Baxter, seems to me the question upon which, as to these two vessels, my decision must depend. To discuss all the evidence having any bearing upon this question in detail, consisting so largely, as it does, of estimates as to bearing and distance all subject to more or less doubt of their reliability, would unduly extend this opinion. Having considered the evidence in connection with those leading features of the situation above referred to, I am obliged to regard the Melrose as so far in error in locating the place of collision where she does as to prevent me from believing that the two steamers in fact approached each other and the place of collision as she claims. I must accept the Vera's account as substantially in accordance with the facts, and hold the Melrose solely in fault for the first collision, unless the Baxter was also in fault for it.

2. I next consider the question of fault arising between the Vera and the Baxter, whether for the Vera's collision with the Melrose or for the subsequent collision between the Vera and the Baxter. On the Vera's behalf it is claimed that the Baxter was lying at anchor where she had no right to be anchored, and where she obstructed the Vera's navigation, first by being directly in that vessel's way while endeavoring to pass the Melrose under a port helm, second by being where the Vera could not get clear of her after the collision. If the Baxter was where she had no right to be, and if her being there produced the first of the above results claimed, she is jointly liable with the Melrose for all damage to both steamers sustained in the first collision. If her being where she had no right to be produced also the second of the above results claimed, and there was no fault on the Vera's part subsequently to the first collision, she is jointly liable with the Melrose for all damage to the Vera in both collisions; the second collision in that case following as a consequence from the first. There is no claim made against her on behalf of the Melrose.

There was uncontradicted testimony at the trial from Edward A. Pease, captain of the harbor police and harbor master of Boston at the time, called by the Vera, that on November 14, 1908, under the authority given him by Mass. Rev. Laws, c. 66, §§ 21, 26-28, to establish anchorage grounds in the harbor and require vessels to anchor within them, he issued rules and regulations, unmodified at the time of collision, which had been published in the daily papers and, in printed form, posted in towboat and pilot offices, or distributed to vessels requiring them, to the number of 200 copies. A copy of these rules, marked "Vera Ex. 14," was put in evidence. They direct (Rule 10) that all vessels anchoring between Spectacle Island and Castle Island shall anchor S. W. of a line drawn from the barn on the hill on Spectacle Island and S. W. end of Castle Island. The witness drew this line on another copy of Chart 264, marked "E. S. D." If the Baxter was anchored where I have above found her to have been anchored, she was not only not within the prescribed anchorage ground, but was at least 1,100 feet outside it, at its nearest point. So far from being S. W.

of the line described, she was that much N. E. of it. That she was lying where the harbor master's rules forbade her to lie, she cannot and does not deny.

The witness testified that he had moved vessels which he had found anchored outside the line and between the two islands mentioned, and that vessels very seldom did anchor there. There was evidence on the Baxter's behalf that those in charge of her did not know of the harbor master's rule, and that, as a matter of fact, vessels frequently did anchor between the two islands and outside the line. The three schooners anchored near the Baxter, which have been referred to above, appeared, so far as their location can be ascertained from the evidence, to have been all outside the harbor master's line, though not so far outside it as was the Baxter.

The Baxter's master testified in his deposition that he anchored where he always considered the proper anchorage to be, that he never had any notice to the contrary from the harbor master, that he never heard of the regulation against anchoring there, that he had anchored in that locality half a dozen times or more, and had seen many vessels anchored in the same locality at all times. He admitted that the locality he referred to was not the particular place he occupied on the evening of the collision, but the general locality to the northwestward of Spectacle Island, and said that he had anchored further to the southward and eastward. The Baxter's mate, who had also been master of her and of other schooners and had held a master's license for ten years, said they had always anchored there, that other vessels had done the same, that it was a usual and customary anchorage, that he had never been notified by the Harbor Master not to anchor there, that he had been at anchor in the vicinity to the S. and W. of the same place a week at a time loaded and four or five weeks light. It did not appear, however, that either of these witnesses had anchored or seen other vessels anchored there since November, 1908, when the rule forbidding it was issued.

I do not think the evidence sufficient to show that the harbor master had impliedly sanctioned the violation of his rules involved in anchoring outside the line indicated by him, as in The John Fraser, 21 How. 184, 16 L. Ed. 106. See The Amiral Cecille (D. C.) 134 Fed. 673; Compagnie, etc., v. Burley (D. C.) 183 Fed. 166; Burley v. Compagnie, etc., 194 Fed. 335, 115 C. C. A. 199, the latter a decision by the Court of Appeals in the Ninth Circuit approving the rulings upon a similar question made in each of the two former cases.

Nor do I think the Baxter has shown any such necessity for anchoring outside the harbor master's limits as excuses her for such a violation of his rules. Mere convenience cannot be enough. If it be true that she could not, with her draft of 25 feet, go safely much further to the southward than where she was, there is another authorized anchorage ground in President Roads, to the north of a line between buoy 6 and Deer Island Light, which she had just passed, and if she was to anchor in the Roads at all, I do not see why she might not have so decided in time to anchor there.

The Baxter is therefore at least prima facie in fault for being anchored where she was. O'Neil v. Sears, 2 Sprague, 52, Fed. Cas. No.

10,530; United States v. St. Louis, etc., Co., 184 U. S. 247, 254, 22 Sup. Ct. 350, 46 L. Ed. 520. In The Amiral Cecille and the two following cases above referred to, it was held that a vessel anchored in a harbor outside the limits prescribed by a city ordinance was, in case of collision between her and a moving vessel, guilty of a statutory fault and within the rule laid down in The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148.

The Baxter's location, as hereinbefore found, was, in my opinion, too near the channel courses regularly followed by vessels passing through the Roads, and too near the point where such vessels expect to make the alteration of course which has been described, to be regarded as out of the channel. Though nearest to its southern side, I cannot doubt that she was within that region lying upon either side of the channel courses which is reasonably and ordinarily necessary for the safe passage past each other of vessels bound in opposite directions. Nor can I doubt that she was in some degree obstructing the necessary manoeuvres of the two steamers here concerned by being where she was. She was so near the point of their collision as to compel the Vera to manoeuvre with reference to her while seeking to pass the Melrose, and so near that, unless after the collision the Vera could succeed in instantly checking headway and coming to a standstill, collision with the Baxter was certain. These conditions, establishing also the violation of a federal statute (Act March 3, 1899, c. 425, 30 Stats. 1121, 1152, § 15 [Comp. St. 1913, § 9920]), require the Baxter to show that her being where she was could not have contributed as a cause to their collision. In this she has not, in my opinion, succeeded. The evidence does not satisfy me that the Vera, though not in fault, under the circumstances, for her collision with the Melrose, might not nevertheless and notwithstanding the Melrose's fault have succeeded in avoiding it, had she had unobstructed water where the Baxter lay.

After the first collision the Vera was of course bound, notwithstanding it, to do all she could to avoid the Baxter. The evidence fails to satisfy me that under the circumstances she could reasonably have been expected to do anything more than was done on her part. The collision with the Melrose pushed her stern to starboard and her bow to port, against her effort to swing the other way under her hard aport helm. It disabled her steering gear. Reversing her engines or dropping her anchor, or both, are the only measures which it is suggested that she ought to have taken. Both these things were done, but not until about the time the Vera fouled the Baxter, whether a little before or a little after is not important. It appears that the Vera's master rang for full speed astern before the collision, but could get no response from the engine room. It appears that the collision aroused fear for their safety among the Vera's crew, that some of them went to the boats, and that complete order among them was not restored until the mate, having looked over the quarter to ascertain what damage she had suffered, had reassured them. Meanwhile the Vera, thus somewhat out of control, was traversing the distance above found to exist between the place of collision and the Baxter. The arguments based on the entries in the Vera's engine-room logs have not seemed to me, in view of all the evidence bearing on the question, sufficient to

vary my conclusions as to this distance. The time the Vera would occupy in traversing it, helped as she was by the tide, must necessarily have been very short. Neither her failure to get her engines reversed and her anchor down within that time, nor the conditions on board her to which the delay was due, can be charged to her as faults; under the circumstances. They must be regarded as consequences of her collision with the Melrose, for which, as above, I hold the Melrose and the Baxter in fault. If this result is right, the second collision was also caused by fault on the part of both those vessels and not fault on the Vera's part.

The following decrees will therefore be entered:

In No. 260, the libel is to be dismissed as against the Vera with costs. There is to be an interlocutory decree in the Baxter's favor against the Melrose, and for an assessment of the Baxter's damages, half of which she is to recover from the Melrose.

In No. 317 and also in No. 318, there is to be an interlocutory decree for the libelants and an assessment of the Vera's damages.

In No. 360 the libel is to be dismissed with costs.

The decree in No. 260 dismissing the libel as against the Vera and the decree of dismissal in No. 360 may, however, be withheld for the present, to be entered when final decrees are entered in Nos. 317 and 318, in order that in case of appeal all four cases may go up together.

## On Settlement of Decree.

[4] The interlocutory decrees directed in the opinion, dated September 14, 1912, were based upon the findings and conclusions set forth in that opinion and upon the state of the pleadings in the respective cases.

According to the findings and conclusions of the opinion, the schooner Malcolm Baxter, Jr., and the steamer Melrose were both to blame as well for the first collision between the steamers Vera and Melrose as for the second collision between the Vera and the schooner.

Upon the libel filed on the schooner's behalf, originally against the Vera and afterward made effective against the Melrose as well—by means of the petition filed therein on the Vera's behalf (No. 260)—a decree against the Melrose for half the schooner's damages was ordered. This was in pursuance of the petition filed on behalf of the Vera, not of the libel, according to which the schooner's owners had charged that the Vera was solely in fault. Neither in that case nor in either of the other cases arising out of the collision had the Melrose pleaded fault on the part of the schooner. In her answer, filed in No. 260 because of the Vera's petition, it was stated that the Melrose as well as the schooner suffered damage; but neither the manner, the particulars, nor the extent of her injuries were alleged. Unless in the prayer for general relief, with which the answer concluded, no relief against the schooner with respect to the Melrose's own damages was asked, and no occasion therefore appeared at the time of the interlocutory decree for any direction regarding them.

If both vessels were to blame for both collisions, as I have held, I see no reason for refusing to the Melrose the right to recoup the

amount of damage she sustained against those she inflicted or caused and is now required to pay. Now that the amount of the damage to her has been ascertained, I do not see that the state of her pleadings in No. 260 necessarily forbids allowance for it in the final decree as between her and the schooner. Ebert v. The Reuben Doud (D. C.) 3 Fed. 529. Amendment of her answer may be necessary, as in that case, and I do not understand that such amendment is objected to.

If the findings and conclusions of the opinion are right, the schooner and the Melrose are to share the total damage to all three vessels; the Vera having the right to recover hers from either of the other two. As between those two, half of what either pays the Vera would seem to be recoverable from the other, together with half the damage recovered for because sustained in either collision.